**TRANSMATIC INC., Plaintiff,**

v.

**GULTON INDUSTRIES, INC., Defendant.**

No. 90–70987.

United States District Court, E.D. Michigan, S.D.

April 8, 1994.

---

Owen E. Perry, Richard W. Hoffmann, Troy, MI, for plaintiff.

Bernard Cantor, Birmingham, MI, Ira Levy, William F. Dudine, Jr., New York City, for defendant.

## OPINION AND ORDER

ROSEN, District Judge.

## I. INTRODUCTION

In the 1967 movie "The Graduate," Dustin Hoffman's character, Benjamin, is taken aside at his graduation party by a friend of his parents, and, with his arm around young Benjamin's shoulder, this family friend tells Benjamin that he has just one word of advice for Benjamin to guide his future: "Plastics." It is unclear in the movie if Benjamin ever got the message. (In the short term, he seemed to have been distracted into other pursuits involving another parental friend, Mrs. Robinson (Anne Bancroft), and her daughter, Elaine (Katherine Ross)).

However, Benjamin Domas, the inventor of the plastic cornice lighting fixture at issue in this case, certainly did get the message about a decade later when he created his device in the late 1970s. By exploiting the versatility and utility of plastics to make his pultruded fixture, Mr. Domas set in motion litigation before the U.S. Patent & Trademark Office ("PTO") and before this Court spanning about fifteen years. Today, this Court hopes to bring at least its own involvement in this matter to an end.

1. Pultrusion is a glass-reinforced plastic material produced by pulling the material through a pultrusion die.

2. Claim 1 of the patent-in-suit reads as follows:
   A cornice lighting fixture for public transit vehicles, the lighting fixture comprising: a unitary member made as a pultrusion from resin and glass fibers so as to have an elongated shape with a uniform cross section along the length thereof, said unitary member including a light housing that defines one longitudinal margin of the fixture and a trim panel that extends vertically and horizontally from the light housing to define another longitudinal margin of the fixture, said light housing opening toward the direction in which light is to be provided by the fixture,

## II. BACKGROUND

Transmatic is the owner (by assignment from Mr. Domas) of patent No. 4,387,415, which was duly issued on June 7, 1983, for an invention entitled "Cornice Lighting Fixtures." This is a lighting fixture that is placed in the cornice of mass transit vehicles, such as busses. It consists of an elongated concave trim panel ("trim panel") that holds an advertising card, and an elongated fluorescent light along one edge of the card holder that illuminates the advertising card and provides general illumination for the vehicle. The light source is formed by a "light housing" and a diffusing "light cover" which together enclose a fluorescent light tube.

As described in the patent, the trim panel and light housing are parts of a unitary member, which is made as a pultrusion [1] from resin and glass fibers, and has a uniform cross section along its length. The lighting fixture may form one wall of an air duct for ventilation in the vehicle. Thus, this fixture is a single-piece unit made from a pultrusion and lights the advertising cards from the front (front-lighting fixture), as opposed to from the back (back-lighting fixture).[2]

In 1983, subsequent to the issuance of the patent-in-suit, Plaintiff reconfigured its trim panel. Plaintiff added an approximately three-inch flange that extended above the light housing along the length of the housing, which had previously formed the upper edge of the illuminated device. This flange is incorporated into the pultruded fixture as one single piece and now itself forms the

said trim panel including one extremity defining the longitudinal fixture margin opposite the longitudinal fixture margin defined by the housing, said one extremity of the trim panel having a tab adapted to mount one edge of an advertising card on the trim panel, said trim panel also including another extremity connected directly to the housing in a fixed relationship thereto and having another tab adapted to mount another edge of the advertising card such that the card is positioned immediately adjacent the light housing; an electrical connector support for mounting a fluorescent tube on the light housing; and a light cover for cooperating with the light housing to enclose a mounted fluorescent tube within the housing.

upper edge of the fixture. Defendant's accused mass-transit vehicle lighting fixture, manufactured subsequent to Plaintiff's reconfigured device, also incorporates this flange as a unitary pultruded part of the fixture.

The original complaint named Mark IV Industries ("Mark IV") as the Defendant and alleged that Mark IV was Plaintiff's competitor in selling lighting fixtures for buses. In a December 21, 1990 order, this Court granted Defendant Mark IV's motion for summary judgment because Mark IV only manufactured and sold this type of fixture (called the Luminator fixture) through its wholly-owned subsidiary Gulton Industries, Inc. ("Gulton"). In that order, however, the Court granted Plaintiff's motion to add Gulton as Defendant.

On January 7, 1992, at the request of Defendant, this Court issued an order staying the case pending the outcome of the PTO's reexamination of the patentability of the instant fixture. On December 1, 1992, the PTO issued a reexamination certificate confirming the validity of the instant patent.[3]

On March 31, 1993, this Court issued an opinion and order deciding, *inter alia,* cross-motions for summary judgment. *Transmatic, Inc. v. Gulton Indus., Inc.,* 818 F.Supp. 1052 (E.D.Mich.1993). The Court held (1) the Domas patent was valid because it was not obvious from the prior art; (2) the accused device did not literally infringe the Domas patent; (3) a question of material fact existed on whether the accused device infringed under the doctrine of equivalents; (4) Plaintiff did not demonstrate that there was no question of material fact on whether Defendant willfully infringed and on whether Plaintiff was entitled to increased damages and attorney fees under 35 U.S.C. § 285; and (5) Plaintiff failed to show the absence of a material question of fact on Gulton's defense that Plaintiff engaged in inequitable conduct before the PTO. 818 F.Supp. at 1060–72.

The remaining issues in the case—namely, equivalent infringement, willfulness, and inequitable conduct—were tried to an advisory jury[4] on October 25–November 15, 1993. On November 8, the Court granted Defendant's motion for judgment as a matter of law on willfulness. Tr. 1098–1101. The Court instructed the jury on the liability issues of equivalent infringement and inequitable conduct and on damages on November 12. The jury was provided with a detailed special interrogatory verdict form, and it returned its advisory verdict on November 15. That verdict read as follows:

> JUROR VERBEKE: We, the jury, after considering the evidence, unanimously find as follows: Infringement under the doctrine of equivalents. Prior art. Does the claim urged by Transmatic under the doctrine of equivalents encompass prior art.
>
> No.
>
> Does the Luminator [accused] device, when compared with the Domas patent, Claim 1, perform substantially the same function?
>
> Yes.
>
> In substantially the same way?
>
> Yes.
>
> To achieve substantially the same result?
>
> Yes.
>
> Inequitable conduct. In prosecuting the Domas patent claim applications, did the inventor and/or his attorney meet their obligations to disclose all material, non-communicative matters—I'm sorry—disclose all material, non-[cumulative] matters to the patent office?
>
> Yes.
>
> Transmatic's damages due to lost profits was[:] $3,023,773.

Tr. 1456.

Upon instruction of the Court, the parties submitted proposed findings of fact and con-

---

**3.** *See* the summary judgment opinion for a detailed chronology of the prosecution of the Domas patent. *Transmatic, Inc. v. Gulton Indus., Inc.,* 818 F.Supp. 1052, 1055–56 n. 3 (E.D.Mich. 1993).

**4.** *See Transmatic, Inc. v. Gulton Indus., Inc.,* 835 F.Supp. 1026 (E.D.Mich.1993) (holding that infringement under the doctrine of equivalents and willful equivalent infringement were matters for the court and not the jury). The jury, of course, was not informed of its purely advisory role.

clusions of law.[5] After reviewing these, as well as all of the evidence presented at trial, the Court is now prepared to enter judgment in this case.

## III. *FINDINGS AND CONCLUSIONS*

### A. *FINDINGS AND CONCLUSIONS ON VALIDITY AND LITERAL INFRINGEMENT.*

1. The Court, seeing no reason to revisit the issues of validity and literal infringement, adheres to its decisions rendered in its March 31, 1993 summary judgment opinion.

### B. *FINDINGS AND CONCLUSIONS ON EQUIVALENT INFRINGEMENT.*

#### 1. *Introduction.*

■ 2. The law of the doctrine of equivalents is well-settled:

> Under the doctrine of equivalents, a patentee must show that the accused device performs substantially the same function, in substantially the same way, to achieve substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). "The 'substantially the same way' prong of the test may be met if an equivalent of a recited limitation has been substituted in the accused device." *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1325–26, 21 U.S.P.Q.2d 1161, 1164–65 (Fed.Cir.1991), *cert. denied*, ––– U.S. ––––, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992). Thus, infringement requires that each limitation of a claim be met exactly or by a substantial equivalent.

*Read Corp. v. Portec, Inc.*, 970 F.2d 816, 822 (Fed.Cir.1992).

#### 2. *Unclean Hands.*

3. Defendant argues that because the doctrine of equivalents is an equitable doctrine, an unclean hands defense is available to it. Moreover, Defendant argues that Plaintiff's failure to fulfill its duty of candor with the PTO and its failure to seek a reissuance of the Domas patent to include the additional flange extending beyond the light housing should preclude it from relying on the doctrine of equivalents.

■ 4. The Court holds, for the reasons set out *infra*, Part III–D, that Plaintiff fulfilled its duty of candor to the PTO. Furthermore, the Court does not find that Plaintiff's failure to make a reissue application to extend the limitations of the patent to include the additional flange is sufficient, without more, to bar Plaintiff from claiming equivalent infringement.

5. Defendant cited *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573 (Fed.Cir.1993), *modified* 15 F.3d 1076 (Fed.Cir.1994), in support of its proposition that a failure to extend claims through a reissue application could be a bar to invoking the doctrine of equivalents. In that case, the patentee sought a ruling of infringement on the equivalents of its chromium-based alloy. A split panel of the Federal Circuit held that the patentee's cancellation of broader claims and its failure to relitigate those broader claims in a continuation application provided a basis for prosecution estoppel such that the patentee could not invoke the doctrine of equivalents. 8 F.3d at 1578, *modified* 15 F.3d at 1076–77.

6. The Court does not believe that *Haynes* supports Defendant's unclean hands argument in the instant case. First, *Haynes* was a prosecution estoppel case, a legal theory which has never been at issue here. Second, upon reconsideration, the Federal Circuit expressly excluded its prior reference to a failure to file a reissue application as a possible ground for prosecution estoppel. Third, the patentee's failure to file a continuation application alone was not grounds for prosecution estoppel; the *Haynes* court specifically rested its finding of estoppel on *both* the failure to continue prosecution *and* the cancellation of the broader claims in the first place. 8 F.3d at 1578. Thus, as noted above, even if the Court were to hold that Plaintiff's failure to make a reissue application was evidence of unclean hands, under *Haynes* it

---

5. Defendant moved to strike certain portions of Plaintiff's proposed findings and conclusions on the ground that they covered matters not within the Court's request. The Court's adherence to all of its earlier decisions, as spelled out *infra*, makes this motion moot.

alone would not be enough to bar application of the doctrine of equivalents.

7. As noted *infra*, n. 20, the Court further believes that Plaintiff had a good faith belief that the patent already covered the additional flange. Plaintiff's failure to make a reissue application probably invited this litigation, and has already cost it the right to recover under a literal infringement theory. Standing alone, however, it is not an adequate basis to deny Plaintiff the right to recover under an equivalence theory.

### 3. *Function, Way, And Result.*

8. With respect to the "function-way-result" test, it cannot be doubted that the accused device performs substantially the same function, in substantially the same way, with substantially the same result. In terms of function, both provide a trim panel for an advertisement card and a light housing for a light which illuminates the front of the card, and both serve as one side of an air duct. *See* Tr. 82 (testimony of Ben Domas). Similarly, in terms of means, both accomplish this function through the use of a unitary pultrusion. *Id.* Finally, in terms of result, both fixtures perform the functions set out above. Tr. 83.

9. Further support for a finding of the accused device's substantially equivalent function, way, and result can be found in the opinion letters of Defendant's own patent counsel regarding predecessor designs to the accused device. *See* D–546D & E (stating that if the Domas patent is upheld over prior art, predecessor designs will equivalently infringe).[6]

10. Defendant strenuously argues that each limitation in the patent, or its substantial equivalent, is not found in the accused device, and that, therefore, there is no infringement. First, Defendant cites the portion of the patent that reads "said unitary member including a light housing that defines one longitudinal margin of the fixture," and argues that the flange extending from the light housing in the accused device is not found in this limitation.

11. As noted in the summary judgment opinion, Defendant is correct that the flange is not found in a literal reading of the patent; hence, the Court's ruling of no literal infringement. 818 F.Supp. at 1068. However, the Court agrees with the advisory jury that the accused device's light housing with the flange was the substantial equivalent of the patent's light housing without the flange.

12. A simple comparison of the patent and the accused device makes this conclusion inevitable. *Compare* P–15 (limitation by limitation reading and diagram of the patent) *with* P–16 (limitation by limitation reading of the patent with diagram of accused device). Such a comparison shows that the flange is merely an extension of the unitary pultrusion, not a separate piece. The Court does not believe that the mere extension of the pultrusion beyond the light housing alters the structure set out in the patent such that the accused device does not perform substantially the same function, in substantially the same way, achieving substantially the same result. *See Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed. Cir.1987) ("To be a 'substantial equivalent,' the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.").

13. The fact that the flange made the accused device a superior fixture because it provided for a greater air duct space than the Domas patent is of no consequence to a finding of infringement. As stated by the Federal Circuit in *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1427 (Fed.Cir.1988), "[t]hat the accused device is an improvement on the claimed subject matter does not avoid infringement even under the doctrine of equivalents."

14. Moreover, Defendant's arguments that the accused device provides superior lighting through changes in the lens cover and the shape of the light housing, and that it has a different ballast arrangement, do not alter this Court's conclusion that each patent limitation or its substantial equivalent is found in the accused device. These factors

---

**6.** A thorough analysis of these letters can be found *infra*, Part III.C.

are not' elements of the claim which this Court must construe and, as noted above, just because the accused device has certain allegedly superior features does not undermine a finding of equivalent infringement.

15. Finally, Defendant argues that Ben Domas admitted in his deposition that the accused device did not have a "uniform cross section along its length" because the accused device had cutouts in the pultrusion for the attachment of a ballast [7] to the fixture. *See* Defendant's Proposed Findings of Fact ¶ 53(c); Tr. 929 (citing Domas Dep., Vol. III, pp. 177–78).[8] Thus, Defendant argues that there is no infringement because the "uniform cross section" limitation is not found in the accused device.

16. After weighing all the evidence, the Court believes that the accused device with ballast cutouts in the pultrusion is still a substantial equivalent of the patent without the cutouts. They are both unitary pultrusions stretching the entire length of a mass transit vehicle. The uniformity of the cross section of the pultrusion is modified only slightly—and after the pultrusion's manufacture—by the presence of any cutouts. Once again, that the cutouts may make the accused device a better fixture carries no weight in a determination of equivalent infringement. The accused device is still a unitary fixture consisting of a light housing and card holder made as a pultrusion. In other words, the accused device still infringes the patent.

### 4. *The Accused Device Does Not Flow From The Prior Art.*

17. Defendant's argument that the accused device flows from the prior art also is unavailing. Defendant is correct that mass-transit vehicle light housings and card holders were in the prior art. *See, e.g.,* Kalt, Arenberg and Schwenkler patents.[9] Defendant is also correct that unitary pultrusions were in the prior art. *See, e.g.,* D–525, 526, 534 & 584 (describing GMC luggage rack).

18. However, the record clearly shows that Ben Domas was the first to bring these two together by using pultrusion technology to create a unitary, lightweight cornice lighting fixture with a card holder. There is no question in the Court's mind, and also apparently that of the advisory jury, that Mr. Domas invented a better mousetrap—one that nobody previously had been able to create. Despite Defendant's protests, it essentially duplicated this invention with its accused device, and, therefore, infringed the patent with an equivalent.

### C. *WILLFULNESS.*

#### 1. *Findings Of Fact.*

19. There is no question that Defendant engaged in an aggressive effort to make a "clone" of the Transmatic device in order to improve its share of the mass-transit lighting fixture market. *See, e.g.,* P–103 (March 11, 1988 memorandum from Defendant's president, David Turney urging the "[u]se [of] a clone of the existing style front-lit product, via a favorably inclined customer, to secure position. . . .").

20. However, it is also undisputed that Defendant sought no less than six opinions from its patent counsel, Mr. Morris Relson, on whether or not its efforts to develop a device to compete with Transmatic would infringe the Domas patent. *See* D–546A–F.

21. The Court finds the last three of those opinions especially relevant to the question of willfulness. The first is dated February 19, 1988, and refers to a predecessor, two-piece design to the accused device found in P–105. *See* Tr. 745. It states:

> Your proposed fixture is in two separate parts. The card holding panel will be a pultrusion. The lamp housing will be a separate aluminum extrusion, of different thickness (because the aluminum is stronger). The aluminum extrusion may be se-

---

7. Mr. Domas defined a ballast as an addition to the light housing which "convert[s] the power from the bus, the battery power . . . into power to drive to the fluorescent tube." Tr. 38.

8. Mr. Domas' testimony at trial, however, was that a unitary pultrusion with or without cutouts still had a uniform cross-section along its length. Tr. 168–69.

9. These patents are discussed in detail *infra,* Part III–D.

cured to the card panel by appropriate fasteners, or there may be a friction or sliding fit without fasteners. Otherwise, the overall configuration is essentially the same as that of Transmatic's patent.

The invention claimed in the patent is directed toward a "unitary" structure, which in some instances (except for claim 2) is a pultrusion. However, if your aluminum extrusion and card panel are secured together, they may be deemed to be "unitary," or at least equivalent to a unitary structure. Except for that distinction, your proposed structure appears to satisfy the language of all claims of the patent.

The proposed structure serves essentially the same purpose as the patented fixture and performs essentially in the same way and is likely to be held an equivalent. I have therefore concluded that, *if the Transmatic patent is held valid,* it is likely to be held infringed by the proposed structure.

As I have stated previously, there is a strong doubt that the patent would be held valid, in view of the earlier Luminator fixtures as well as the Grimes fixture you referred to.[10]

The case for invalidity of the patent is further strengthened by two prior art patents, namely Arenberg et al. 2,587,807 and Kalt 3,065,161, whose drawings are attached. Both of these patents show a light housing at the upper edge of a card panel. If the limitations "unitary" and "pultrusion" are disregarded from the basic Transmatic patent claims 1 and 2 then these claims would read upon these prior art patents and be rendered invalid.

On the other hand, if the "unitary" and "pultrusion" limitations are deemed to distinguish the patent from the prior art, then the patent is similarly distinguished from your proposed structure, and should be held not infringed.

\* \* \* \* \* \*

[T]he defense of invalidity could only be established after litigation. Of course the

risk of litigation occurring cannot be forecast; it would be up to Transmatic as to whether it would seek to enforce its patent by litigation. Alternatively, Gulton could initiate a declaratory judgment action to declare that it has no liability under the patent. The cost of such litigation and the residual risk that the patent may be held valid and infringed are factors militating against use of the proposed structure.

D–546D (emphasis in original).

22. The second letter is dated July 6, 1988, and refers to another two-piece predecessor design to the accused device found in P–69. It states:

I understand that the main part of the fixture is proposed to be made as two pultrusions to be cemented together. Whether this is done in a single pultrusion, or in two parts cemented together is immaterial to the question of infringement or patentability. As I pointed out to Gerald [Irion, Defendant's vice president for research and development at the time], the Examiner himself took that position in the course of the prosecution of the Transmatic patent, and Transmatic in effect acquiesced, in arguing for other features in support of patentability. Indeed, two cemented-together portions can be deemed to be "unitary."

I have advised Gerald that in my view it would make little if any difference in the litigation, if the pultrusion was made in one piece, or in separate pieces cemented together. Where there is no good practical reason, from the functioning or cost viewpoint, for making it in separate pieces rather than in one piece, a cemented-together two-piece element would be deemed the equivalent of a one-piece element in my judgment.

As I told Gerald, *if the prior art is disregarded,* in my judgment claims 1 and 2 of the patent would be deemed infringed.

*However, because of the prior art, there is no infringement because it is an established principle that merely using the prior art to a patent cannot infringe the*

10. See D–546B for a discussion of at least one 1950 Luminator design. D–512 provides a description of the Grimes device referred to above.

*patent.* In such a case, either the prior art invalidates the patent, or to be valid over the prior art, the patent must be so narrowly construed as not to be infringed. *In my judgment, the prior art here is sufficiently close so that this is the case.*

Here, except for the use of pultrusions, and the use of a one-piece panel, the prior art Arenberg and Kalt patents anticipate claim 1 of the Transmatic patent. The same is true of Luminator's 1950 designs and the Grimes design.

D–546E (emphasis added).

23. Finally, in a letter dated May 30, 1989, Mr. Relson opined on the designs found in P–33 and P–34. Importantly, P–33 is the accused device in this action. *Compare* P–33 *with* D–600. With respect to these two designs, Mr. Relson stated:

Patent claim 1 calls for a unitary member *including a light housing* that *defines one longitudinal margin* of the fixture. On the form with the hinge access panel [P–34], not only is the pultrusion *not* a unitary member which includes a light housing, but in addition the light housing does *not* form the longitudinal margin of the fixture, as the patent claims. Rather, the fixture extends beyond the light housing to a mounting point by a significant distance.

The form of fixture without hinged access panel [P–33] is similar, except that there is a unitary pultrusion member which includes light housing, as shown in your drawing 0106343 [P–72].

D–546F (emphasis in original).

24. As noted in Mr. Relson's May 30, 1989 letter and in the summary judgment opinion, 818 F.Supp. at 1067, the accused device contains a three-inch extension, or flange, of the pultrusion that defines one longitudinal margin of the fixture and that is not found in the Domas patent.

25. David Turney, Defendant's president, testified upon the Court's own examination that in his decision to proceed with the accused device he relied in good faith upon Mr. Relson's opinions that the Domas patent would not be infringed. More specifically, he relied upon Mr. Relson's conclusions that (1) the Domas patent would not be upheld over the prior art, and (2) that even if it were upheld, the accused device still flowed from the prior art. Tr. 509–510. The Court finds this testimony to be credible.[11]

26. Mr. Turney also testified that Defendant began production of the accused device prior to receipt of the May 30, 1989 letter from Mr. Relson, Tr. 561, and that Mr. Relson would have known this. Tr. 561, 566–67. Mr. Turney characterized his request for the May 30, 1989 letter as a "double-check" that Defendant was not infringing the Domas patent. Tr. 560.

27. Plaintiff asserts that the infringing activity began when Defendant allegedly committed to building the accused device in March or 1988. *See* P–100, P–103, & P–149. Plaintiff argues in the alternative that infringement began when Defendant made a request to Creative Pultrusions around June 30, 1988, for quotations regarding, *inter alia,* pultrusion tooling. *See* P–159.

28. P–149 is a memorandum dated March 8, 1988, which was made by David Turney and which describes a meeting with a representative from Flxible Corporation, a potential customer. In that memorandum, Turney states that the representative responded to Turney's suggestion that Defendant could provide inexpensive bus-lighting devices by saying, "Looks like we can have a workable deal here; give it to me in writing." P–149 at 4.

29. P–103 is a March 11, 1988 memorandum also made by Mr. Turney. In it, he states: "As you will see from a separate trip and action report, through Flxible, we have a

---

11. Wallace Aikens, a designer for Defendant, testified to the effect that Defendant relied upon Mr. Relson's opinion that the Domas patent would be held invalid in making its decision to go to market with the accused device; he made no mention of reliance on Relson's related, but distinct, opinion that the accused device would not infringe regardless of the validity of the Domas

patent. Tr. 864–65. To the extent that this testimony conflicts with Mr. Turney's, the Court finds Mr. Turney's more probative of Defendant's reliance. It is undisputed that Mr. Turney is the one who made the final decision whether to go ahead with the accused device, so his state of mind is the one that is crucial.

good *probability* of basis to re-enter this business." P–103 at 1 (emphasis added).

30. P–159 is a response dated July 11, 1988, from Creative Pultrusions to a request by Defendant for price quotations relating to pultrusion. The response refers to a June 30, 1988 drawing sent by Defendant, but there is no indication that Defendant made its request for the price quotations *before it* received Mr. Relson's July 6, 1988 opinion letter. In addition, the response from Creative Pultrusions states, "Of course, all prices are subject to final approved part drawing."

31. Finally, P–100 is a meeting trip report dated April 20, 1989, made by Mr. Turney. The report states that "All tests [of the accused device] have been completed to Flxible's satisfaction ... and a prototype bus set of fixtures has been installed." Thus at this point, at least one accused device had been manufactured. However, the letter also states: "We are now at the point of needing to extract Flxible P.O.'s for the 'standard' pultrusion front-lit type fixture." It is unclear when these purchase orders from Flxible arrived—and, thus, when final and binding sales of the accused devices actually began.

### 2. *Conclusions Of Law.*

32. The patent statute permits Plaintiff the recovery of increased damages at the Court's discretion. 35 U.S.C. § 284. It also provides that "in exceptional cases" attorney fees may be awarded. 35 U.S.C. § 285.

33. In interpreting these sections, the Federal Circuit has held:

> In determining whether an infringer acted in bad faith as to merit an increase in damages awarded against him, the court will consider the totality of circumstances ... including (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation.

*Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986) (citation omitted).

34. The Federal Circuit has also held that such willfulness must be shown by clear and convincing evidence. *E.I. Du Pont de Nemours & Co.,* 849 F.2d 1430, 1440 (Fed. Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988).

35. With respect to reliance on attorney opinions, the Federal Circuit has established clear standards. First, the attorney's opinion must meet the competent opinion test set out in *Underwater Devices Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380 (Fed.Cir.1983):

> [An opinion must] contain[ ] within its four corners a patent validity analysis, properly and explicitly predicated on a review of the file histories of the patents in issue, and an infringement analysis that, *inter alia,* compared and · contrasted the potentially infringing ... apparatus with the patented inventions ... [so as to] contain[ ] sufficient internal indicia of creditability to remove any doubt that [the infringer] received a competent opinion.

717 F.2d at 1390.

36. However, and importantly, an opinion by counsel need not be correct in order for a court to find there was no willful infringement. In the words of the Federal Circuit:

> *While an opinion of counsel letter is an important factor in determining the willfulness of infringement, its importance does not depend upon its legal correctness.* Indeed, the question arises only where counsel was wrong. *Rather, counsel's opinion must be thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable.*

*Ortho Pharmaceutical Corp. v. Smith,* 959 F.2d 936, 944 (Fed.Cir.1992) (citations omitted) (emphasis added).

37. Applying these standards to the instant case, the Court believes that Defendant had a good faith belief, based on Mr. Relson's letters, that the Domas patent would not be upheld over the prior art or, alternatively, that the accused device flowed from the prior art regardless of the Domas

patent's validity. Given this good faith reliance on Mr. Relson's letters, a finding of willful infringement would be inappropriate.

38. With respect to the "copying" factor of *Bott*'s test for willfulness, Plaintiff argues that Mr. Turney's memorandum urging the development of a clone of the Domas device proves that Gulton did in fact clone that device. P–103. The record reveals, however, that Defendant experimented with a number of possibilities in an effort to design around the patent. The design Gulton ultimately settled upon did infringe the Domas patent, but only as an equivalent. Indeed, the product that Gulton ultimately went to market with was not an exact clone of the Domas patent in that it contained the additional flange. In light of this fact, the Court does not find that Mr. Turney's use of the term "clone," without more, provides sufficient evidence of willful copying of the Domas patent.[12]

39. With respect to the "investigation" prong of the *Bott* test, there can be no question that Defendant, through Mr. Relson, investigated the validity of the patent and the possibility that both predecessor designs and the final design of the accused device infringed the Domas patent. Plaintiff, however, attacks Defendant's reliance on Mr. Relson's letters as a basis for avoiding a finding of willfulness on two grounds. First, Plaintiff argues that none of Mr. Relson's letters are competent opinions under the *Underwater Devices* test. Specifically, Plaintiff argues that the letters failed to apply the correct standards for anticipation and for viewing the patent as a whole, and that Defendant, therefore, could not in good faith rely upon them. *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1571 (Fed. Cir.1986) (test for anticipation), *modified*, 231 U.S.P.Q. (BNA) 160 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987); *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed.Cir.1984) (patent as a whole should be viewed in obvious inquiry).

40. However, as pointed out in *Ortho Pharmaceutical*, the correctness of an attorney's opinion does not solely inform its importance. The question is not whether his opinion is correct, but whether it is thorough enough to instill a good faith belief in the infringer that he *may* not infringe.

41. A simple review of Mr. Relson's last three letters as quoted above indicates that he carefully reviewed the Domas patent file, certain material prior art references, and corresponding sketches of the accused device as it was being developed. From this, he ultimately concluded that Domas' validity would not be upheld and that, even if it were, the accused device would not infringe it because of the additional flange. *See* D–546E & F.

42. The fact that Mr. Relson's opinion that the Domas patent was invalid was, in the end, incorrect does not negate its reasonableness when made and the reasonableness of Defendant's reliance upon it. As noted in the summary judgment opinion, 818 F.Supp. at 1070, the question of the validity of the Domas patent was a close one. Three different PTO examiners rejected the Domas device as within the prior art no less than four times. Because Mr. Relson was thorough and, indeed, almost correct in his analysis, this Court simply cannot find that Defendant unreasonably and in bad faith relied upon his opinions.

43. Moreover, with respect to the flange, this Court has already held that this additional element in the accused device negated a finding of literal infringement. 818 F.Supp. at 1067–68. Thus, once again, Mr. Relson identified for Defendant a reasonable ground on which it could in good faith argue that its device did not infringe Domas. *See* D–546F.

44. Plaintiff's second argument challenging Defendant's reliance on Mr. Relson's opinions is that this Court should disregard

---

12. However, with respect to whether the accused device was a direct copy of the Domas patent, even if it were, that would not be dispositive proof of willfulness. If, as the Court will shortly find here, Defendant had a good faith, well-informed belief that the patent itself would ultimately be held invalid, that would be sufficient to negate willfulness. It is simply not a willful infringement if there is a good faith, well-informed belief that the patent itself is invalid. Copying may be probative of a "willful" infringement, but it is not dispositive.

his last two letters because they were issued after infringing activity began. Plaintiff cites case law from the Federal Circuit indicating to this Court that the issuance of an opinion after infringing activity begins is indeed a factor to consider in determining whether the opinion was competent and whether an infringer could reasonably rely upon it. *See American Medical Sys. v. Medical Eng'g. Corp.*, 6 F.3d 1523, 1531 (Fed.Cir.1993); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 656 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985); *Underwater Devices, supra*, 717 F.2d at 1390.

45. 35 U.S.C. § 271 states that "whoever without authority makes, uses, or sells any patented invention within the United States during the term of the patent therefor, infringes the patent." *See also, e.g., Reynolds Metals Co. v. Continental Group, Inc.*, 525 F.Supp. 950, 972 (N.D.Ill.1981); *Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1381 (W.D.La.1980), *aff'd*, 667 F.2d 1232 (5th Cir. 1982). The Court reads the statute and the surrounding case law it has found to indicate that Defendant infringed Plaintiff's patent once it started actual production and/or sale of the accused device. Plaintiff has cited no case to the contrary.

46. As noted above, Plaintiff established at trial that Defendant had produced and installed a prototype of the accused device at least a few weeks before Mr. Relson issued his last opinion. *See supra*, ¶¶ 26, 31.

47. The Court is equally satisfied, however, that production and/or sale of the accused device did not take place before Mr. Relson's July 6, 1988 letter. The evidence Plaintiff seeks to rely upon to show that infringement began in March or at least June of 1988 is unpersuasive. Mr. Turney's March memoranda, P–103 and P–149, and the July 11 price quotation from Creative Pultrusions, P–159, clearly indicate that Defendant was not yet in the production stage of the accused device. Rather, Defendant was designing it and pricing its cost. Moreover, the April 20, 1989 report in which Mr. Turney stated a prototype had been manufactured and installed also indicated that Flxible had yet to issue actual purchase orders for the accused device. P–100. The trial record, then, is devoid of evidence supporting the conclusion that as of the July 6, 1988 letter from Mr. Relson, Defendant was already engaged in the manufacture, let alone sale, of the accused device.

48. Moreover, the fact that Mr. Relson's letter was issued sometime after Defendant began producing the accused device does not change the Court's belief, after looking at the totality of circumstances, that (1) Mr. Relson's opinion that Defendant would not infringe because Domas and/or the accused device flowed from the prior art was thorough and competent, and (2) that Defendant could and did rely in good faith on that opinion. The only thing that Mr. Relson's last letter added to his earlier analysis was that the additional flange of the accused device was further reason it would not be held to infringe the Domas patent—and that this was true even if Luminator used a unitary pultrusion.

49. As noted earlier, Mr. Relson was correct that this addition was a significant distinction between the accused device and the Domas patent—significant enough, in the end, to warrant a finding of no literal infringement. Furthermore, this last comment did not in any way refute Mr. Relson's earlier arguments that Domas would not be upheld over the prior art. In light of these two facts, the Court does not believe that the last letter, simply by virtue of being issued after infringement began, could not be part of the basis of a reasonable, good faith belief that the accused device did not infringe.

50. Because Mr. Relson's opinions were such that one could reasonably rely upon them, and because this Court has found that Mr. Turney did rely upon them, the Court holds that the "investigation" factor of the *Bott* inquiry weighs strongly in favor of a finding of no willful infringement.

51. In terms of the "litigation" prong of the *Bott* test, Plaintiff argues that Defendant showed its bad faith by repeatedly delaying these proceedings. Specifically, Plaintiff points to Defendant's successful efforts (1) to have this Court dismiss Mark IV, the original Defendant, allegedly on false pretenses, and

(2) to have the patent reexamined. Plaintiff points out that both these efforts occurred well after the instant proceedings were underway. Plaintiff also argues that Defendant's introduction of a clearly non-infringing mass-transit lighting device in October, 1993, when combined with the delaying tactics in these proceedings described above, somehow together indicate a strategy to use an infringing device to establish a market for a non-infringing device.

52. The Court merely notes that even if it fully credits such arguments of illicit strategizing on the part of the Defendant, it does not rise to clear and convincing evidence of willful infringement of the patent. Whether Plaintiff agrees or not, the case for willfulness boils down to whether Defendant reasonably relied on Mr. Relson's letters that the accused device did not infringe the Domas patent. Because this Court, after reviewing the totality of circumstances, does find that Defendant, specifically, Mr. Turney, could and did rely in good faith on these opinions, it holds that Gulton did not willfully infringe the Domas patent.

53. Plaintiff, however, refuses to quit. If the Court should find no willfulness prior to Defendant's alleged notice as of September 9, 1992, of the PTO's intent to reissue the Domas patent, Plaintiff argues that the Court should nonetheless hold that willful infringement existed after that date. Plaintiff notes that as of that date Defendant had notice that the Domas patent did not flow from the prior art. Furthermore, because Mr. Relson's opinions were based in part on a finding of the invalidity of the Domas patent, Plaintiff asserts that after notice of the PTO's intent to reissue Defendant could no longer rely upon those opinions.

54. Plaintiff's argument is unpersuasive. First, this Court did not hold the patent valid until March 31, 1993. The Court was not bound by the PTO's prior determination, and, thus, any willfulness on Defendant's part based on the validity of the Domas patent could not commence until this later date.

13. *See* Jt. Ex. H.

55. Further, and more importantly, Mr. Relson's last two letters demonstrate that in addition to questioning the validity of the Domas patent, he also believed that the accused device's final designs flowed from the prior art, regardless of Domas' validity. And at least in the last opinion, Mr. Relson hinged this argument on the additional flange found in the accused device but not described in the patent.

56. Thus, even assuming that Defendant could no longer rely on Relson's argument that the Domas patent was invalid as of September 9, 1992, or March 31, 1993, it still could—and, given Mr. Turney's credible testimony, did—rely upon his opinion that Defendant's device nonetheless flowed from the prior art.

57. The actual question of whether the accused device flowed from the prior art has not been answered—until today. Defendant's good faith reliance on Mr. Relson's letters, then, has not been completely misplaced—until today. The Court, therefore, refuses to find willfulness any time before this decision is issued.

58. For these reasons, then, the Court holds that Plaintiff's effort for increased damages and attorney fees under 35 U.S.C. §§ 284 and 285 must fail.

## D. *INEQUITABLE CONDUCT.*

### 1. *Findings Of Fact.*

#### a. Underlying facts.

59. On April 30, 1979, Plaintiff filed its original patent application with the PTO. Jt. Ex. C at 1. At all relevant times, James Kushman, Esq., was the prosecuting attorney for the Domas patent before the PTO.

60. Plaintiff's application described the pultrusion process through which the Domas device was made as "well known." *See* Jt. Ex. C at 11.

61. On March 18, 1980, Examiner Monroe Hayes of the PTO rejected Plaintiff's claims on the ground that Kalt 3,035,161 [13] and Arenberg 2,587,807 [14] made the Domas device obvious. *See* Jt. Ex. C at 22. Examiner

14. *See* Jt. Ex. G.

Hayes affirmed his rejection on August 1, 1980, because of, *inter alia,* Schwenkler 3,210,875,[15] Kalt and Arenberg. *See id.* at 61–62.

62. Plaintiff originally filed an appeal of this decision, but later withdrew it in favor of a continuation application. *See id.* at 63, 65.[16]

63. On November 24, 1980, Plaintiff filed a continuation application with the PTO. That continuation application clearly referenced the parent application. Jt. Ex. C at 22.

64. In the continuation application, Plaintiff added to its substantive claims the following "method claim:"

> A method for manufacturing a unitary member of a lighting fixture for public transit vehicles comprising: coating layers of glass fibers with resin; pulling the resin coating layers and fibers over a mandrel to define a cross section including a light housing and trim panel; and heating the cross section after passage over the mandrel to cure the resin such that the consequent hardening thereof integrates the glass cloth layers and glass fibers into a unitary member including a light housing and a trim panel.

*See* Jt. Ex. D at 22. The continuation application further stated that the method claim had been filed "to improve the claim format by incorporating a method claim which describes the manufacturing technique utilized to make the unitary member of the cornice lighting fixture." *See id.* at 25.

65. Mr. Domas, however, testified at trial that he did not invent this method claim nor did he authorize Mr. Kushman to prosecute it. Tr. 185–86.

66. Plaintiff's continuation application was reviewed by Examiner Donald Walsh. On June 22, 1992, Examiner Walsh rejected

Plaintiff's claims as obvious in light of Schwenkler. *See* Jt. Ex. D at 33.

67. Plaintiff filed an amendment to its continuation application on September 13, 1982. In the amendment, Plaintiff cancelled the method claim. Mr. Kushman also made the following argument to distinguish the Domas claim from Schwenkler:

> In the Schwenkler 3,210,875 patent, the light fixture 13 includes a plastic light transforming panel 16 having clear plastic lens sections 35 and 37 and an intermediate display section 36 on which an advertising card 52 can be mounted. This plastic light transmitting panel 16 does not function as a light housing in the manner disclosed and claimed by applicant nor does the panel open toward the direction in which the light is to be provided in the manner now recited by all of the claims and defining applicant's light housing. As such, even if it were obvious to make the plastic light transmitting panel of Schwenkler as a pultrusion in view of the prior art, there still would be no provision of the invention now claimed.

*See* Jt. Ex. D at 63. *See also* Jt. Ex. H (diagram of Schwenkler).

68. On February 28, 1983, Examiner Walsh approved the patenting on Plaintiff's remaining claims, including claim 1 in this suit. *See* Jt. Ex. D at 66.

69. Examiner Walsh made no reference to Kalt and Arenberg in any part of his review of the continuation application.

### b. Testimony regarding inequitable conduct.

70. Defendant's expert witness, Professor Martin Adelman, testified that Plaintiff violated its duty of candor to the PTO in two different ways.

71. First, Professor Adelman testified that it was improper for Plaintiff to file a method claim if it did not have a good faith

---

15. *See* Jt. Ex. I.

16. Defendant's expert witness, Professor Martin Adelman, testified that a continuation application is exactly what it sounds like:

> [I]f the applicant wants to pay some more money, the Patent Office is willing to bargain for a longer period of time.

> [The applicant] pay[s it] some money and [it] will continue the examination. And the way [the applicant] do[es] this is by filing what is called a continuation application, which is just what it says. It's just continuing with the original application.

Tr. 622.

belief that this claim was patentable. Tr. 656–57. Furthermore, Professor Adelman suggested that Plaintiff may have filed the method claim as a stratagem to get a new examiner (rather than Examiner Hayes, who had rejected the parent application). Tr. 644, 656.

72. Second, Professor Adelman testified that he believed Plaintiff violated its duty of candor to the PTO when Mr. Kushman made the above-quoted argument to distinguish Schwenkler from Domas. Professor Adelman interpreted Mr. Kushman's argument to be that Schwenkler lights up the card holder from the back whereas Domas lights the card holder from the front. *Compare* Jt. Ex. H (Schwenkler) *with* Jt. Ex. A (Domas). Professor Adelman also testified that such a statement was misleading in that Mr. Kushman failed at the same time to mention and distinguish Kalt and Arenberg, both admittedly front-lighted fixtures. Tr. 650–51.[17]

73. Mr. Kushman testified that he believed that he added the method claim so as to increase the potential royalties which would flow from the patent. Tr. 966. Furthermore, Mr. Kushman testified that he believed the method claim was valid because it "covers the adaptation of the pultrusion process to make a [mass transit vehicle lighting fixture] product in a way that it had never been made before." Tr. 968.

74. Finally with respect to the method claim, Mr. Kushman testified that by filing a continuation application with a method claim, he did not believe that he would get a new examiner, nor did he intend such a result. Mr. Kushman noted that continuation applications normally are reviewed by the examiner of the parent application, and he suggested that Plaintiff's continuation application

may have gone to Examiner Walsh merely as a way to even out the work among examiners. Tr. 970–71.

75. With respect to failing to weave Kalt and Arenberg into his arguments to distinguish Domas from Schwenkler, Mr. Kushman testified that he believed they were cumulative of Schwenkler. More specifically:

a. Kalt, unlike Domas, was not a unitary structure consisting of a light housing and card holder. If it had been, the structural support to the transit vehicle ceiling provided by the Kalt device would have been impossible to achieve. Tr. 1004. *See also* Jt. Ex. H.[18]

b. Arenberg, unlike Domas, was not a unitary structure consisting of a light housing and card holder. Arenberg was solely a light fixture which relied upon the existence of a recess in the transit vehicle ceiling which would have been created, in part, by having a separate card holder. If the card holder and light housing were a single piece, then the necessary recess upon which Arenberg relies would not already be in place. Tr. 1007–08. *See also* Jt. Ex. G. Moreover, Arenberg's design permitted the intermittent spacing of lights, without the need to intermittently space card holders. *See* Jt. Ex. G, Figure 7.[19]

c. Schwenkler, however, taught a single-piece light transmission panel and card holder which was similar to Domas' unitary light-housing and card-holder arrangement. In fact, in Schwenkler part of its light transmission panel doubled as the back of the card holder. Tr. 1011–12. *See also* Jt. Ex. I.

76. Mr. Kushman also testified that he did not disclose Kalt and Arenberg in the

---

17. It is Defendant's further contention that Mr. Kushman knew or should have known at the point he made this argument that Examiner Walsh had not examined the prior art listed in the parent application. According to Defendant, Mr. Kushman had such actual knowledge because (1) Examiner Walsh's original rejection of the continuation application did not cite Kalt and Arenberg and (2) it also did not contain an indication that the parent application had been reviewed as is required by the Manual of Patent Examining Procedure § 2001.06(b). *See* D–660.

18. Indeed, this distinction was upheld by the PTO upon reexamination of the Domas patent. Jt. Ex. E at 1091.

19. The distinctions noted above were recognized upon reexamination of the Domas patent by virtue of Examiner Cole's statement: "[i]f the fixture of Arenberg et al. were made to be a single piece, it would lose the taught advantage of allowing the lights to be located along the vehicle in various arrangements as desired." Jt. Ex. E at 1091.

prosecution of the continuation application because they were referenced in the parent application. Thus, he believed that the second examiner, Examiner Walsh, was already on notice of the existence of Kalt and Arenberg. Tr. 993.

### 2. Conclusions of Law.

■ 77. A patentee is guilty of inequitable conduct if it committed fraud on the PTO. More particularly:

Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence.

*Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 872 (Fed.Cir. 1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

■ 78. A finding of inequitable conduct makes a patent unenforceable. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

79. The duty of candor before the PTO in effect at the time of the prosecution of the Domas patent read as follows:

A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. *Such information is material where there is substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.* The duty is commensurate with the degree of in-

volvement in the preparation and prosecution of the application.

37 C.F.R. § 1.56 (1982) (emphasis added).

80. Despite the broad definition of materiality set out above, the Federal Circuit has also stated that "a patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already in front of the examiner." *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1440 (Fed.Cir.1991).

■ 81. Applying these standards to the instant case, the Court does not believe that Mr. Kushman filed the method claim in the Domas continuation application in a deliberate attempt to mislead the PTO. It is true that Mr. Domas stated that he did not invent the method claim as presented and that he did not authorize Mr. Kushman to prosecute the same. However, Mr. Kushman offered credible testimony that he filed the method claim in an effort to gain potentially greater royalties, and because he believed in good faith that the use of pultrusion technology to create a unitary light-housing and card-holding device for mass transit vehicles was a patentable invention.

82. In addition, Mr. Kushman withdrew the method claim before Examiner Walsh made his final decision regarding Domas' product claims, thus curing any possible earlier misrepresentation.

83. Lastly, and most importantly, the record is completely devoid of any evidence that the filing of the method claim automatically resulted in the reassignment of the Domas patent application to a new examiner, and that Mr. Kushman intended such a result. Defendant simply did not offer any evidence, through Professor Adelman or otherwise, that PTO procedures have ever mandated a reassignment to an examiner other than the parent application's examiner when a method claim is filed. Absent this kind of showing, the Court, like the advisory jury empaneled in this case, does not believe that Plaintiff engaged in inequitable conduct by filing the method claim in the continuation application.

■ 84. The Court also agrees with the advisory jury that Mr. Kushman did not deliberately mislead Examiner Walsh by fail-

ing to specifically cite Kalt and Arenberg in the prosecution of the continuation application. Upon reflection, the Court adheres to its initial ruling, stated in the summary judgment opinion, that Kalt and Arenberg were material to Domas. *See* 818 F.Supp. at 1072. The Court bases that ruling on the grounds that:

a. Examiner Hayes rejected the parent Domas application in part because of Kalt and Arenberg. Jt. Ex. C at 22, 61.

b. Examiner Richard Cole ordered reexamination of the Domas patent in light of Kalt and Arenberg. Jt. Ex. E at 86.

c. Examiner Cole originally rejected claims 1 and 2 of the Domas patent because of, respectively, Kalt and Kalt and Arenberg. Jt. Ex. E at 1028–30.

85. Plaintiff argues that the Federal Circuit has clearly stated that there is no rule that prior art which has been the basis of a patent application's rejection is *per se* material. *See Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 273 (Fed.Cir.1988). However, *Lummus* involved only a single rejection, by a single examiner, of some of the patentee's claims because of nondisclosed prior art. 862 F.2d at 273. Here, two different examiners on three separate occasions found Kalt and Arenberg material enough to either deny the patent application or call for its reexamination. Such facts leave the Court no choice but to find Kalt and Arenberg material under the clear language of the duty of care provision governing this case.

86. However, although the Court finds Kalt and Arenberg were material, the Court also believes that Mr. Kushman lacked any intent to deceive the PTO in not specifically referencing them in the continuation application.

87. First, Mr. Kushman clearly referenced the parent application, which included mention of Kalt and Arenberg, in Plaintiff's continuation application. As a consequence, any finding of intent to mislead the PTO would have to be premised upon the notion that Mr. Kushman had reason to believe when he filed the continuation application that the PTO itself, despite being advised of the parent application by Mr. Kushman, would not review it and notice the Kalt and Arenberg references. The fact that Examiner Walsh did not cite Kalt and Arenberg in his initial rejection of the continuation application, and that he did not indicate that he had reviewed the parent application in accord with § 2001.06(b) of the Manual of Patent Examining Procedures, are just not enough, in the Court's opinion, to demonstrate (1) that Examiner Walsh did in fact fail to review the parent application and/or (2) that Mr. Kushman had actual knowledge of such a failure. Indeed, without more, such a finding would be speculation based upon suspicion.

■ 88. Thus, the Court finds that Mr. Kushman had a basis for a good faith belief that he had put Examiner Walsh on notice of Kalt and Arenberg by virtue of the fact that the continuation application clearly referenced the parent application. While prosecuting attorneys have a duty to be candid with the PTO, that office's examiners also have a duty to review the prior art that is before them. *See, e.g., Kingsdown*, 863 F.2d at 874 n. 8 ("[N]othing in the statute or Manual of Patent Examining Procedure would justify reliance on counsel's candor as a substitute for an examiner's duty to examine the claims.").

89. Furthermore, the Court also is convinced that Mr. Kushman had a good faith belief that he had no duty to disclose Kalt and Arenberg because they were cumulative of Schwenkler. Mr. Kushman testified, and the PTO in its reexamination of the Domas patent agreed, that Kalt and Arenberg were multi-piece light-housing and card-holding fixtures which, respectively, supported or relied upon certain features of surrounding structures. In contrast, Domas and, to a lesser extent, Schwenkler taught unitary light fixture/card holder devices, and both were also relatively much less supportive of or dependent upon surrounding structures.

90. Thus, the Court finds that a good faith argument can be made—and was made by Mr. Kushman—that Schwenkler is more material to Domas than Kalt and Arenberg because Schwenkler is closer to Domas' unitary, independent structure. This fact, then, provides a second basis for the Court's conclusion that Mr. Kushman did not intention-

ally attempt to mislead Examiner Walsh by failing to mention Kalt and Arenberg in his successful efforts to distinguish Domas from Schwenkler.

91. For these reasons, the Court holds that Plaintiff did not engage in inequitable conduct so as to render the Domas patent unenforceable.[20]

### E. DAMAGES.

■ 92. The advisory jury empaneled in this case returned a verdict of $3,023,773.00. Tr. 1456. The Court finds this verdict was supported by the evidence, and, therefore, it adopts the verdict.

93. Mr. Dealey offered credible evidence that Plaintiff would have made all of Defendant's sales but for Defendant's infringement with the accused device. Tr. 1131–34. See Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1326 (Fed.Cir.1987) (but-for test for lost profits hinges on proof of "the demand for the product, the absence of acceptable non-infringing substitutes, and [the patentee's] ability to meet the demand"). Indeed, because it is undisputed that Plaintiff and Defendant are the only competitors in the market for this kind of device, it is reasonable to infer that Plaintiff would have made all of Defendant's sales. Del Mar, 836 F.2d at 1327.

94. Turning to the calculation of lost profits, Plaintiff's expert, Bruce Correll, estimated Plaintiff's losses to be $3,445,886.00. A review of the verdict, his report and the transcript indicates that the jury accepted his figure, with two reductions:

a. Sales by Defendant for separate, allegedly infringing luggage sets in the amount of $122,113.00.

b. An estimate of price increases that Plaintiff would have been able to charge had there been no competition from Defendant. This figure was estimated at approximately $300,000.00. Tr. 1183.

95. The Court believes that the jury was reasonable in generally accepting Mr. Correll's calculations, as his report and testimony were thorough and credible.

96. The Court further believes that the jury acted properly in making the two reductions noted above. The Federal Circuit has held that purely speculative injuries are not recoverable. Del Mar, 836 F.2d at 1327. The Court finds that the record was inadequately developed to permit a reasonable inference that (1) Plaintiff would have been able to raise its price at will even if it were the sole supplier of mass-transit lighting fixtures, and (2) that Plaintiff had and was ready to sell the luggage sets Defendant sold—or, for that matter, that these luggage sets even infringed the patent. The Court notes that Plaintiff has, apparently, conceded these points by asking for entry of judgment on the advisory jury's verdict. See Plaintiff's Proposed Findings and Conclusions, p. 69.

97. Defendant attempted to undermine Mr. Correll's analysis with a number of recalculations made by its expert, Aron Levko. The advisory jury, however, apparently discarded these as unsupported by the evidence. This Court agrees with the advisory jury's decision. As it noted on the record, if one were to accept Mr. Levko's testimony, it would appear that Defendant did Plaintiff a business favor by infringing its patent. Tr. 1282.

98. The Court, therefore, orders Defendant to pay Plaintiff damages in the amount of $3,023,773.00.

### IV. CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant is enjoined from any further manufacture, use, or sale of the accused device.

---

20. At trial, the Court examined Onward Dealey of Transmatic on why Plaintiff did not file an amendment to the Domas patent to include the three-inch flange added to the device in 1983. The Court was concerned that Plaintiff may have failed to file the amendment in order to keep the PTO from reopening the file and discovering the failure to cite Kalt and Arenberg in the prosecution of the continuation application. After examining Mr. Dealey, however, the Court was satisfied that Transmatic failed to file an amendment because it had a good faith belief that the patent encompassed such a flange. Tr. 1089–92.

544

IT IS FURTHER ORDERED that Plaintiff and Defendant make arrangements for the retrieval and disposal of all non-sold accused devices in the possession of third parties. Such arrangements are in no way to involve depositing such items with this Court.

IT IS FURTHER ORDERED that Defendant pay to Plaintiff the sum of $3,023,773.00 in damages for equivalent infringement of its patent.