**HAYNES INTERNATIONAL, INC., Plaintiff–Appellant,**

v.

**JESSOP STEEL COMPANY, Defendant–Appellee.**

No. 91–1410.

United States Court of Appeals, Federal Circuit.

Nov. 1, 1993.

doctrine of equivalents, and granted its request for attorney fees. Haynes only appeals the judgment on the doctrine of equivalents issue. We *affirm* the grant of summary judgment, and *reverse* the grant of attorney fees.

## I. BACKGROUND

Haynes is the current owner of the '414 patent, which issued on August 6, 1985. The '414 patent is directed to a corrosion-resistant nickel-based alloy containing chromium, molybdenum, and tungsten. Cabot Corporation (Cabot) is the former owner of the '414 patent and thus is Haynes' predecessor-in-interest. Cabot was responsible for securing the issuance of the '414 patent. Jessop is the manufacturer of an alloy which Haynes alleges infringes its patent.

On December 18, 1987, Haynes filed a complaint against Jessop in the District Court for the Western District of Pennsylvania charging Jessop with, *inter alia,* infringement of the '414 patent. Jessop subsequently filed an answer denying patent infringement and a counterclaim seeking declaratory relief. On September 4, 1990, after the parties had conducted limited discovery, Jessop filed a motion for summary judgment of non-infringement, invalidity, and unenforceability of the '414 patent, and a request for attorney fees.

The court then referred the matter to a magistrate pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) (1988). On January 9, 1991, the magistrate issued a report recommending that Jessop be awarded summary judgment of non-infringement. The magistrate did not address Jessop's motion for summary judgment of invalidity or unenforceability because he found these issues to be moot. The magistrate also did not address Jessop's request for attorney fees.

When Jessop objected to the magistrate's failure to address its request for attorney fees, the magistrate, on March 22, 1991, issued a supplemental report reaffirming the non-infringement recommendations in the previous report, and recommending that Jessop be awarded attorney fees on the basis that Haynes should have known that its in-

Victor M. Wigman, Wigman & Cohen, P.C., Arlington, VA, argued for plaintiff-appellant. With him on the brief was Lynn J. Alstadt, Buchanan Ingersoll, P.C., Pittsburgh, PA.

William H. Webb, Webb, Burden, Ziesenheim & Webb, P.C., Pittsburgh, PA, argued for defendant-appellee. With him on the brief was Kent E. Baldauf.

Before RICH, NEWMAN and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

This is a patent infringement case, involving infringement under the doctrine of equivalents. Haynes International, Inc. (Haynes) appeals the final decision of the United States District Court for the Western District of Pennsylvania (Civil Action No. 87–2717) entered on June 14, 1991. The district court granted Jessop Steel Company's (Jessop) motion for summary judgment of non-infringement of U.S. Patent No. 4,533,414 (the '414 patent), both literally and under the

fringement claim would be barred by prosecution history estoppel, and its suit was therefore frivolous. On May 21, 1991, the district court judge, in a memorandum order, adopted the magistrate's recommendations. On June 14, 1991, the court entered a final decision granting Jessop's motion for summary judgment of non-infringement, and awarding Jessop attorney fees in accordance with the previous memorandum order. This appeal followed.

## II. DISCUSSION

The sole claim in the '414 patent reads:
1. The wrought product form of an alloy consisting essentially of, in weight percent, **about 22 chromium,** about 13 molybdenum, about 3 tungsten, less than 0.5 columbium, less than 0.5 tantalum, less than 0.1 carbon, less than 0.2 silicon, less than 0.5 manganese, about 3 iron, less than 0.7 aluminum plus titanium, less than 0.5 vanadium and the balance nickel plus impurities wherein the ratio of molybdenum to tungsten is within the range 3:1 to 5:1, wherein the ratio of iron to tungsten is within the range 1:1 to 3:1, and wherein said ratios provide said alloy with an optimum combination of corrosion resistant properties in a variety of corrosive media and hot and cold working properties to permit production of thin sheet, tubing and other commercial forms. (Emphasis ours.)

The dispute in this case centers on the **about 22 chromium** limitation, Jessop conceding that its alloy meets all the other limitations of the claim. It is undisputed that Jessop's alloy has a chromium content of between 20.74 to 20.81%. The district court[1] concluded that this limitation is not met by Jessop's alloy, either literally or under the doctrine of equivalents. The basis for its conclusion on the doctrine of equivalents issue was prosecution history estoppel. That portion of the judgment is before us on appeal.

### A. Standard of Review

█ This court reviews a grant of summary judgment to determine whether any genuine issues of material fact are in dispute,

and whether any errors of law were made. *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1537, 20 USPQ2d 1456, 1458 (Fed. Cir.1991).

█ We review an award of attorney fees to determine if the district court abused its discretion or made its determination under an erroneous conception of the law. *Bayer Aktiengesellschaft v. Duphar Intern. Research,* 738 F.2d 1237, 1242, 222 USPQ 649, 652 (Fed.Cir.1984).

### B. Infringement Under the Doctrine of Equivalents

#### 1.

As originally filed in the Patent and Trademark Office (PTO), the '414 application contained nine claims, of which only claims 1, 4, and 5 are relevant here. Those claims read in relevant part:
1. An alloy consisting essentially of, in weight percent, **20 to 24 chromium,** ... (Emphasis ours.)

 \* \* \* \* \* \*

4. The alloy of claim 1 wherein the alloy contains **about 21 to 23 chromium,** ... (Emphasis ours.)
5. The alloy of claim 1 containing **about 22 chromium,** ... (Emphasis ours.)

Claim 1 was the only independent claim in the application. Claims 4 and 5 were dependent from claim 1. As is evident, the claims recited progressively narrower ranges of chromium content. The chromium content of Jessop's alloy was included within the specific terms of original claim 1, and perhaps original claim 4 (the *about* question).

During prosecution, the examiner rejected claims 1, 4, and 5 for obviousness on the basis of U.S. Patent No. 3,203,792 to Scheil et al. (hereinafter "Scheil"), the commercial embodiment of Scheil, known as the C–276 alloy, and U.S. Patent 1,836,317 to Franks. The principal difference between the claimed subject matter and the cited prior art was that the claims recited a different but over-

---

1. All the magistrate's conclusions were adopted *in toto* by the district court. Therefore, the magistrate's conclusions are the district court's conclusions.

lapping range of chromium content.[2] The examiner considered this difference to be immaterial.

To rebut the examiner's rejection, Cabot amended claim 1 in a manner which is not material to this appeal. It also submitted test data purporting to show that the claimed range of chromium content results in unexpected advantageous corrosion resistance properties. Cabot generated the test data by preparing samples of alloys having varying compositions, and then measuring the corrosion resistance properties of each. Significantly, the only alloy which Cabot prepared which was within the literal scope of the pending claims was an alloy having a chromium content of 21.96% known as the C–20 alloy.

Cabot further submitted an affidavit (the Manning affidavit) which stated that "the chromium range of 20% to 24% [recited in claim 1] is very critical, and merely increasing (or decreasing) chromium content does not expectedly result in better overall corrosion resistance to a variety of corrosive media."

The examiner responded by issuing a final action rejecting the claims on the basis of Scheil. After again amending claim 1 in a manner which is not material to this appeal, Cabot appealed to the Board of Patent Appeals and Interferences (Board). The Board ruled that the examiner had established a *prima facie* obviousness rejection of the claims as unpatentable over the combination of Scheil and its C–276 alloy.[3] The Board noted that all limitations except chromium content were expressly met by the C–276 alloy, and that it would have been presumptively obvious to modify the chromium content of that alloy to achieve the claimed chromium content in view of the teachings in Scheil.

However, with regard to claim 5, the Board decided that Cabot, through submission of the test data for the C–20 alloy, had successfully rebutted the *prima facie* rejection. According to the Board, this evidence showed that an alloy within the scope of that claim, the C–20 alloy, had unexpected properties over the prior art. Accordingly, the Board reversed the examiner's rejection of that claim.

With regard to claims 1 and 4, the Board decided that the proffered evidence failed to rebut the *prima facie* rejection of these claims on the grounds that "[i]t is conjectural whether the improvements shown would also be exhibited by all alloys within the scope of the claims, *other than Alloy C–20.*" [Emphasis added]. Accordingly, the Board affirmed the examiner's rejection of· claims 1 and 4.

Cabot then rewrote claim 5 in independent form, and cancelled claims 1 and 4. Despite the fact that the statement in the Manning affidavit, attesting to the criticality of the claimed chromium content, suggested that Cabot had or was able to generate such additional test data, and that Cabot might have assumed that the Board's action, in allowing claim 5, indicated that the submission of additional test data would have procured the issuance of claims 1 and 4, Cabot never submitted additional test data or continued prosecution of claims 1 or 4 (through a continuation or reissue application). The patent issued with claim 5 (renumbered as claim 1) as the sole claim.

### 2.

The essence of prosecution history estoppel is that a patentee should not be able to obtain, through litigation, coverage of subject matter relinquished during prosecution. *See Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d

---

**2.** The *only* difference between original claim 1 and the prior art was as to chromium content— Scheil discloses a chromium range of 14 to 26%, and preferably, 22 to 25%, whereas claim 1 recited a chromium range of 20 to 24%. Although there were other differences between original claims 4 and 5 and the prior art, Cabot never argued before the PTO that these additional differences were patentable distinctions.

**3.** The Board's position was consonant with this court's precedent holding that when the difference between the claimed invention and the prior art is the range or value of a particular variable, then a *prima facie* rejection is properly established when the difference in range or value is minor. *In re Woodruff,* 919 F.2d 1575, 1578, 16 USPQ2d 1934, 1936 (Fed.Cir.1990); *Titanium Metals Corp. of America v. Banner,* 778 F.2d 775, 783, 227 USPQ 773, 779 (Fed.Cir.1985).

861, 870, 228 USPQ 90, 96 (Fed.Cir.1985). The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent. *See Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.,* 743 F.2d 1581, 1583, 223 USPQ 477, 478 (Fed.Cir.1984); *Kinzenbaw v. Deere & Co.,* 741 F.2d 383, 389, 222 USPQ 929, 933 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985).[4] In this case, a reasonable competitor could have concluded that Cabot, by cancelling claims 1 and 4 and retaining claim 5, and failing to submit additional test data to procure the issuance of those claims in a continuation or reissue application, gave up coverage that would have included Jessop's alloy. Such a conclusion is supported by the fact that chromium content was the principal distinction between the claimed subject matter and the prior art, and thus was the primary area of dialogue between Cabot and the PTO. It is also supported by the fact that Cabot took these actions in the face of the implied representation in the Manning affidavit that Cabot had or could generate additional data; the Board's statement that it was "conjectural" whether the data Cabot had submitted would support the patentability of any alloy other than the C–20 alloy; and the strong suggestion, based on the Board's conduct in allowing original claim 5 based on the C–20 test data, that the submission of additional data would have procured the issuance of these claims. Thus, Haynes is estopped from asserting coverage of Jessop's alloy under the doctrine of equivalents.

The concurrence reads more into this court's decision than is there. Ordinarily, prosecution history estoppel arises when an applicant affirmatively relinquishes subject matter (either through amendment, argument or outright cancellation of a claim) in the course of prosecution. In this case, the estoppel arises not only from the cancellation of original claims one and four, but also from the failure to continue prosecution of these claims (in a continuation or reissue application) in light of the Board's action with regard to original claim 5. The Board allowed original claim 5 on the basis of the C–20 test data submitted by Cabot, thus signalling Cabot that the submission of additional test data might procure the allowance of the other claims. Since prosecution had concluded and the Board did not remand the case to the examiner for additional substantive prosecution[5], Cabot's purpose in cancelling these claims was unclear. It could have intended to refile them in a subsequent application. Therefore, on these facts, the cancellation of these claims did not conclusively establish that Cabot wanted to relinquish coverage of the subject matter encompassed by them, and thus did not necessarily create an estoppel. It is only when the cancellation is considered along with Cabot's failure to refile these claims and submit additional test data to support them can it be said that an estoppel was conclusively established.

### 3.

On appeal, Haynes argues that the district court erred when it concluded that Haynes is estopped from asserting *any* range of equivalents. That issue is not properly before us since it is not raised by the facts of the case. The only proper question is whether Haynes is estopped from asserting coverage of the accused product, Jessop's alloy. We have concluded, based on our independent review of the '414 prosecution

---

4. Ordinarily, the test for interpreting the meaning of a claim term is determined from the vantage point of one skilled in the art. *See Smithkline Diagnostics v. Helena Lab. Corp.,* 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir.1988). This test would seem equally appropriate for determining what subject matter was relinquished in the context of prosecution history estoppel. Our precedent dealing with this specific question recites that that test is measured from the vantage point of a reasonable competitor. *See, e.g., Prodyne,* 743 F.2d at 1583, 223 USPQ at

478. We do not see these formulations as inconsistent—the point is the knowledge of one reasonably skilled in the art who views the question from the perspective of a competitor in the marketplace; regardless of the perspective, the applicable law remains the same.

5. Under 37 C.F.R. §§ 1.196(c), 1.197(a) (1992), the case was returned to the examiner solely for the purpose of carrying into effect the Board's decision.

history, that Haynes is. Therefore, any error in that regard made by the district court is harmless.

 Haynes also argues that the prior art does not foreclose it from asserting a range of equivalents encompassing Jessop's alloy. We reject this argument because it implies that the limits on the doctrine of equivalents imposed by prosecution history estoppel can be no broader than that imposed by the prior art. However, the prior art and prosecution history estoppel are separate and distinct limitations on the doctrine of equivalents. *See Loctite Corp.,* 781 F.2d at 870, 228 USPQ at 96. Therefore, the limits imposed by prosecution history estoppel can be, and frequently are, broader than those imposed by the prior art. Whether the prior art would have precluded Haynes from successfully invoking the doctrine of equivalents in this case is not before us; it is enough that the prosecution history does.

Haynes next argues that Cabot failed to obtain broader claim coverage during prosecution simply because it lacked the test data necessary to do so, not because it intended to relinquish this subject matter. This argument, however, is unpersuasive on these facts; the question is not what Cabot might have done or meant to do, but what it did. It is also not credible because it conflicts with the implied representation in the Manning affidavit that Cabot had, or could generate, the data. It is also not persuasive, even if true, because it leaves unexplained why Cabot did not submit the data at a later time in conjunction with a continuation or reissue application.

 Haynes' final argument is that there is no estoppel because Cabot never amended original claim 5 during prosecution. We reject this argument because it exalts form over substance. It also conflicts with our precedent, which has consistently recognized a broad range of activities which can give rise to prosecution history estoppel. There is of course the classic example of prosecution history estoppel—an amendment in response to a prior art rejection. *See* 4 Chisum § 18.05[2], at 18–157—18–158 (1992). But our precedent encompasses other conduct as well: statements contained in a disclosure document placed in the PTO file as well as representations made during prosecution of the parent application;[6] remarks made during prosecution of a claim not in suit as well as statements made after the examiner indicated the claims in suit were allowable;[7] and arguments submitted to obtain the patent.[8] Thus, an estoppel can be created even when the claim, which is the basis for the assertion of infringement under the doctrine of equivalents, was not amended during prosecution.

We have considered the remaining arguments made by Haynes, and do not find them persuasive. Accordingly, we find no error in the district court's conclusion that Haynes is estopped from obtaining coverage of Jessop's alloy under the doctrine of equivalents.

## III. ATTORNEY FEES

 The district court awarded Jessop attorney fees because Haynes "should have been aware" that it was foreclosed from asserting a range of patent scope that encompassed Jessop's alloy. Title 35, section 285 authorizes a district court to award attorney fees to a prevailing party in "exceptional" cases. Courts have recognized that, in certain instances, a "frivolous" case can be "exceptional" for purposes of 35 U.S.C. § 285 (1988). *Bayer,* 738 F.2d at 1242, 222 USPQ at 652. A frivolous infringement suit is one which the patentee knew or, on reasonable investigation, should have known, was baseless. *See Eltech Systems Corp. v. PPG Industries, Inc.,* 903 F.2d 805, 810, 14 USPQ2d 1965, 1969 (Fed.Cir.1990). We review the district court's award for an abuse of discretion.

6. *See, e.g., Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1173–75, 26 USPQ2d 1018, 1025–26 (Fed.Cir.1993)

7. *Hormone Research Foundation, Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1564 n. 9, 15 USPQ2d 1039, 1044 n. 9 (Fed.Cir.1990), *cert. dismissed,* 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991)

8. *Townsend Eng'g Co. v. Hitec Co.,* 829 F.2d 1086, 1090, 4 USPQ2d 1136, 1139 (Fed.Cir. 1987).

■ We find that Haynes' suit below was not baseless because Haynes had a reasonable chance of proving that the Jessop alloy literally infringed the claim. As previously stated, Jessop concedes the accused alloy meets all the limitations of the claim except the chromium content limitation. Moreover, the chromium content of Jessop's alloy differs from that recited in the claim only by about 1%. The use of the term *about* in the claim, and the allowance of the claim on the basis of the C-20 alloy, permits some leeway in the required chromium content. Although Haynes chose not to pursue this question on appeal, the issue of frivolousness here is determined at the time suit was filed and throughout the time it was maintained. *See Eltech Systems*, 903 F.2d at 810, 14 USPQ2d at 1969. Accordingly, we hold the district court abused its discretion when it awarded attorney fees.[9] Therefore, we reverse that award.

■ This court has recognized that an appeal may be frivolous under two distinct standards: 1) the appeal is frivolous as filed because there is no basis for reversal in law or fact; or 2) the appeal is frivolous as argued. *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 948 F.2d 1573, 1578-79, 20 USPQ2d 1738, 1742 (Fed.Cir.1991), *reh'g denied* (Fed.Cir.1991). The question of frivolousness on the appeal is a closer question. As noted, Haynes limited its appeal to the doctrine of equivalents issue. Although Haynes' positions on that issue on appeal were notably weak, we are not convinced we can say they were frivolous. Giving Haynes the benefit of the doubt, we decline to award attorney fees to Jessop for the appeal.

## IV. SUMMARY AND CONCLUSION

For all the foregoing reasons, we *affirm* the trial court's judgment of non-infringement under the doctrine of equivalents on the ground Haynes is foreclosed, through prosecution history estoppel, from obtaining coverage of Jessop's alloy; and *reverse* the award of attorney fees.

9. Thus, we do not need to address Haynes' argument that the award of attorney fees violated its

## COSTS

Each party to bear its own costs.

*AFFIRMED-IN-PART and REVERSED-IN-PART.*

PAULINE NEWMAN, Circuit Judge, concurring in the judgment.

I share the conclusion that literal infringement is not before us, that infringement does not lie under the doctrine of equivalents, and that attorney fees were incorrectly granted. I write separately lest dicta in the panel majority's discussion of the doctrine of equivalents be misinterpreted as enlarging the scope of prosecution history estoppel.

In this case certain claim scope was cancelled during patent prosecution, after a rejection based on prior art. The patentee had not overcome the rejection by making a sufficient showing of superior properties. This action resulted in a classical prosecution history estoppel, deciding the case.

### Grounds of Estoppel

The district court decided the equivalency of Jessop's alloys, based on the standard criteria of what had been invented, what had been claimed, the prior art, the prosecution record, and what the accused infringer had done. It was not disputed that Jessop's alloys were of the same multi-metal composition as those claimed by Haynes, varying only in the small difference in the percentage of chromium. Jessop conceded that its alloys performed the same function in the same way to achieve the same result of improved corrosion resistance. Jessop also conceded that it had adjusted the chromium content in order to avoid Haynes' claim to "about 22" percent chromium.

Haynes (through its predecessor Cabot) had cancelled its broader claims after the examiner's rejection on the Scheil patent was not overcome with sufficient experimental evidence of superior properties, and was unsuccessfully appealed to the Board of Patent Appeals and Interferences. The district

due process rights.

court held that Haynes was estopped to assert a range of equivalents that reached the range of 20.74–20.81 percent chromium; that is, that Haynes was estopped from reaching the Jessop alloys.

In appealing this holding, Haynes makes the argument that the prior art did not require the restriction to "about 22" percent chromium, and that the Board's holding of unpatentability of the broader claims was due solely to the absence of sufficient experimental data to support the broader claims. Haynes states that the data now before the district court and this court show that the properties described in the Haynes specification are indeed possessed by Jessop's alloys. Haynes thus argues that the patentee is not estopped from asserting equivalency.

The panel majority first, appropriately, rejected Haynes' argument on the ground that the rejection was indeed based on the prior art, and that Haynes' failure to support the broader claims left them correctly rejected on the Scheil reference, producing a classical estoppel. I join in that conclusion—which should end the matter. However, the majority then discusses, as a ground of estoppel, that Haynes could have generated or presented additional supporting data at the time of patent prosecution, but did not do so. The majority also deems it significant that Haynes did not file a continuation or reissue application after the Board's decision, in order to continue prosecution with additional data.

I do not think that failure to continue prosecution beyond full examination is or should be a ground of estoppel. I am concerned lest these remarks present the impression that a new basis for estoppel is being promulgated based on actions the patentee could have taken to obtain broader claims, but did not. It would be new to the law of estoppel to require that negative inferences be drawn from what the patentee might have done but did not. I can think of no interest that would be served by creating a new field of litigation concerning whether the patentee could or should have generated and presented additional experimental data at the time of prosecution, or by continuation

or reissue application, as a prerequisite to an assertion of infringement through equivalency. To require or infer that the inventor must keep the patent application from issuance while refiling and reprosecuting, lest the opportunity to avoid estoppel be forever forfeited, itself raises important policy questions. Also, I need not remind the panel majority that broader claims can not be obtained by reissue after two years, even if the patentee can persuade the Office that the original claim scope was due to error.

### Policy Considerations

The broadening of prosecution history estoppel is a corollary to the narrowing of the doctrine of equivalents. There is a policy component to such holdings, of importance to the technology community. Before a court undertakes to modify longstanding law and practice, even in dictum, it should know the effect of this change on those the law is intended to serve. Caution is required, lest our inexperience with the ways of industrial innovation leads us to adopt a purported solution of unforeseen consequences.

Patent protection, if easily circumvented, does not enhance the incentive for industrial innovation. Richard C. Levin *et al.*, in *Appropriating the Returns from Industrial Research and Development*, 3 Brookings Papers on Economic Activity 783 (1987), thus criticizes the effectiveness of the patent system as an innovation incentive. These policy issues are of particular concern to this court, which is charged with the body of law whose purpose is to support creativity and innovation. If it is desired to enlarge the restrictions on a patentee's recourse to the doctrine of equivalents, by stretching the grounds of estoppel, this should be explored by the technology community, not legislated by this court.